Filed 1/8/26  P. v. Rodriguez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FRANCISCO RODRIGUEZ,<br><br>    Defendant and Appellant. | F088045<br><br>(Super. Ct. No. VCF434244A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Nathan G. Leedy, Judge.

Robert Navarro, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Julie A. Hokans and Dina Petrushenko, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant and appellant Francisco Rodriguez was convicted by a jury of second degree murder with a true finding he personally and intentionally discharged a firearm causing death. The charges arose out of a fight and shooting at a convenience store in Visalia. Defendant's group and the victim's group converged at the store. The two groups yelled and made hand gestures toward each other. The confrontation escalated to a physical fight between the groups that spilled out of the store. The victim and the victim's cohort fought with defendant but then appeared to abandon the fight and ran toward the victim's truck in the parking lot. Defendant pursued, pulled out a handgun, and shot the victim twice in the back. The victim died from his wounds.

Defendant contends: (1) the trial court abused its discretion by admitting prejudicial gang expert testimony; (2) the prosecutor committed misconduct during her closing arguments; and (3) the murder conviction is not supported by sufficient evidence because no rational jury would conclude defendant did not act in self-defense or in the heat of passion.

We affirm the judgment.

## PROCEDURAL SUMMARY

On November 13, 2023, the Tulare County District Attorney filed an information charging defendant with the willful, deliberate, and premeditated murder of Alfonso Barrera (Pen. Code, § 187, subd. (a)). (Undesignated statutory references are to the Penal Code.) The information further alleged defendant personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and personally used a firearm (§ 12022.53, subd. (b)).[1]

---

[1] The information alleged three aggravating factors that were later dismissed at the prosecution's request.

On April 18, 2024, the jury acquitted defendant of first degree murder but convicted him on the lesser offense of second degree murder with a true finding on the allegation he personally and intentionally discharged a firearm causing death.

On May 13, 2024, the trial court sentenced defendant to 25 years to life consisting of 15 years to life for the murder conviction plus a consecutive 10-year enhancement for personally using a firearm (§ 12022.53, subd. (b)).

Defendant filed a timely notice of appeal.

## FACTUAL SUMMARY

### A. **The Fight and Shooting**

At approximately 1:30 a.m. on August 7, 2022, Barrera was at an ampm convenience store on Lovers Lane in Visalia. Barrera was accompanied by Florencio Mejia Meraz and an unidentified man.[2] Barrera was waiting outside the store near his blue pickup truck in the parking lot while his cohort was inside buying beer. While Barrera was waiting, Miguel Torres, defendant, and defendant's brother, Rene Rodriguez,[3] pulled up to the ampm's parking lot in a gray compact car.

Rene went inside the ampm passing Barrera's cohort walking out carrying beer. Defendant and Torres came into the ampm shortly after.

Defendant, Rene, and Torres went to the back of the store to pick out an item and then got in line to pay. As the group was waiting, Rene exited the store and walked back to the gray car. He opened the car's driver's side door, leaned inside, then backed out of the car and closed the door. Rene walked back inside the store and waited inside the vestibule.

---

[2]    Of the two men with Barrera, only Meraz was identified at trial. We refer to the unidentified third man as Barrera's "cohort."

[3]    Because defendant and his brother share the same last name, we refer to Rene by his first name for clarity. Rene was the individual in the store's videos wearing a black shirt and pink shorts. Defendant was wearing a shirt that said "Cookies."

From the vestibule, Rene made a hand gesture by flashing a number four with one hand and a number one with the other hand toward Barrera's group outside. Barrera was sitting in the truck's passenger seat and made hand gestures in response to Rene. Rene motioned to defendant and defendant came over to Rene in the vestibule. Rene took off his shoes. Barrera and Meraz rushed inside the ampm. Meraz and Rene fought each other while Barrera fought defendant. Barrera's cohort followed and joined the fight with defendant which spilled out of the ampm. Defendant ended up down on the ground. Barrera and his cohort repeatedly struck and kicked defendant while he was down. Barrera's shirt came off during the fight. Barrera's cohort stopped striking defendant and ran toward Barrera's truck with Barrera following. Defendant got up and pursued while pulling a handgun out of his shorts pocket. He racked the gun's slide, held the gun with both hands, and fired six times in Barrera's direction as Barrera was getting into the truck's passenger seat. Barrera was shot twice in the back. His cohort ducked down to the ground on the truck's driver's side as shots were fired.

Defendant ran away, stopped briefly in the ampm's parking lot, and then continued running away out of the lot. Barrera slumped in the truck's passenger seat as his cohort got in, started up the truck, and backed the truck out of its parking space. The cohort stopped the truck for Meraz to get in the backseat. He then drove off.

B. **Law Enforcement Investigation**

Visalia Police Officer Jose Chavez was dispatched to the ampm in response to a 911 call reporting shots fired. Chavez spoke with the ampm's cashier, Adriana Haro, and canvassed the scene. He located six spent .40-caliber bullet casings directly in front of the ampm.

At approximately 1:47 a.m. on the night of the shooting, Visalia Police Officer Marcus Henry responded to a possible suspect vehicle on Westcott Avenue. Henry discovered Barrera's truck with Barrera inside. He pulled Barrera out of the truck and attempted CPR but was unsuccessful. Barrera was pronounced dead at the scene and

identified by the driver's license in his pocket.

Barrera's truck was searched by the police pursuant to a search warrant. Blood was on the front passenger seat. There were bullet holes on the truck's passenger side and both the front driver's side and passenger's side windows were shattered. Projectiles were recovered from the truck. Inside the truck, the police found two open beer containers and a leafy substance that appeared to be marijuana. A 24-pack of beer was in the truck bed. Barrera's and Meraz's cell phones were inside the truck, as well as Meraz's wallet.

Visalia Police Sargeant Andrew Saelee obtained the ampm's surveillance videos that had recorded various angles of the store's exterior and interior during the altercation and shooting. The videos did not record audio. The trial court admitted the videos as evidence without objection. Saelee used still images from the videos to create a be-on-the-lookout (BOLO) flyer of the suspects in the shooting. Tulare County Sheriff Diego Ramos saw the BOLO and recognized defendant as they grew up together in the same town, Terra Bella.

The police also obtained surveillance videos from properties in the ampm's vicinity. The videos showed defendant fleeing on foot after the shooting.

On August 11, 2022, Samuel Pierce, an employee of a storage facility, found a loaded gun magazine on the canal bank. The magazine had three live .40-caliber rounds inside. The police retrieved the magazine as evidence. The gun involved in the shooting was never found. On the day of the shooting, Pierce saw Rene on the facility's property. Pierce told Rene he was on private property and must leave. He took pictures and video of Rene. Surveillance videos from the early morning of August 7, 2022, showed Rene appearing to search for something near the storage facility and other areas in the ampm's vicinity.

The police obtained the records for a Snapchat[4] account associated with defendant. Screenshots of defendant's Snapchat account from July 27, 2022, showed defendant's tattoos including a "TB" on his neck and palm trees on the other side of his neck. A video posted to defendant's account from September 7, 2022, showed he was in Cosala, Mexico. Another video on his Snapchat account from September 6, 2022, showed defendant in a vehicle with a handgun in the vehicle's seat back pocket.

An arrest warrant issued for defendant. He was taken into custody at the Southern California border on June 8, 2023.

## C. Medical Evidence

Dr. Thomas Bennett, the Tulare County forensic pathologist, opined that Barrera died from two gunshot wounds that entered through his back. One bullet went through Barrera's torso and exited the left side. The other bullet went up through the jaw, exited through Barrera's mouth, and injured his left hand. One of the bullets perforated both lungs. Death was not instantaneous but occurred within several minutes of the wounds. Bennett opined the wound that went through Barrera's lungs was nonsurvivable. Barrera also had a laceration on the bridge of his nose. He was five feet 10 inches tall and 249 pounds when he died. Barrera's blood tested positive for alcohol, cocaine, and inactive metabolite THC (marijuana).

## D. Gang Evidence

### 1. Adriana Haro's Testimony

Adriana Haro was working as a cashier at the ampm at the time of the shooting. Haro was aware of gang violence from growing up in Farmersville. She knew the Norteños used the color red while the Sureños used the color blue, and that there are numbers associated with the gangs.

---

[4]     Snapchat is a multimedia messaging application that allows users to communicate with each other.

Haro testified two groups of men came into the ampm to buy alcohol while other customers were in the store. She heard men in the groups saying, "F the 13 and F the 14." Haro believed the first group of men who came in were "southerners" because she heard the group yelling "f[***] the north, norte." She "automatically knew it was gang related" upon hearing "f[***] the north, norte." Haro also believed this group were southerners because they were wearing blue while the other group of men "had a little bit of red on." She testified the group outside the store were "[n]ortherners" because they were saying "f[*** s]outhside and then [n]orthside, so it's like automatically it's gang related." The two groups went back and forth verbally before they started hitting each other. Haro did not see who threw the first punch and tried to get the groups out of the store while they fought. She saw defendant fighting with two other individuals before he ended up outside the store.

Haro went to call 911 with her coworker and heard gunshots outside. After the gunshots, the blue truck left first, and the gray car left right after.

Haro identified defendant to police in a photo lineup. She did not hear defendant say anything like northerner or southerner that night though she associated him with the red group.

While Haro testified the group outside the store (the blue group) initiated the interaction and fight between the groups, she later said she did not know who made the initial statement or started the fight. She confirmed the first yelling she heard was "f[***] norte" from the outside group and that group rushed into the store.

2. **Gang Expert's Testimony**

Over defendant's objection, Lance Kirk testified as a gang expert at trial. Kirk is an investigator with the Tulare County District Attorney's Office and has been a peace officer for 17 years. Before becoming an investigator, he was a police officer in Porterville where he worked in a special unit as a gang detective for a couple years. Kirk testified that a criminal gang is defined as a group of three or more people with an

identifying name or symbol whose members commonly engage in criminal activity. Gang members carry weapons as one of their primary objectives is committing crimes and to protect against rival gang members.

The primary gangs in Tulare County are the Norteños and Sureños. The Norteños originated in the 1960s in the California prison system when they formed a gang called the Nuestra Familia. The gang was created to protect its members from and in response to the Sureños, the main prison gang also referred to as the Mexican Mafia. The Norteños and Sureños are rival gangs. There is a divide in territory between the gangs. Generally, the Norteños claim territory in Northern California while the Sureños claim territory in Southern California.

The Norteños's identifying symbol is the number 14, which represents the letter "N" and stands for Nuestra Familia. The gang will also commonly use four dots or X4 in graffiti to represent 14. They use the color red. A Norteño gang member may use hand signals to indicate the gang they represent. This could be an "N" or number four with their fingers, or a number one with one hand and a number four with the other hand. Norteño gang members may have tattoos identifying themselves by a 14 or the town or barrio they are from. A "TB" tattoo could be gang related to indicate the Terra Bella Norteño.

The Sureños's identifying symbol is the number 13, which stands for the letter "M" for Mexican Mafia. The gang is also referred to as "La M," Spanish for "The M." They identify with the color blue.

Respect plays a big role in gang culture. One of a gang's primary objectives is to gain respect from the public and rival gang members. Flashing a Norteño gang sign at somebody suspected to be a Sureño gang member would be considered offensive and a form of disrespect. Gang members also disrespect each other by yelling out gang slurs like derogatory terms about the rival gang. If a Sureño gang member were to yell "f[***]

norte," that would be offensive to a Norteño gang member. Likewise, yelling "f[***] south side," would be offensive to a Sureño.

The Norteños have certain rules their members must follow called the 14 bonds. One rule is that a member must jump in and help another Norteño gang member in danger. If there is a fight between a Norteño and Sureño, and a Norteño in the vicinity did not join in, this would violate the 14 bonds. There are repercussions for failing to abide by the bonds. The Sureños have their own set of similar rules. A Sureño would likewise be expected to join a fight between a Norteño and Sureño and also face repercussions for failing to do so.

## DISCUSSION

I. **Admission of Gang Expert's Testimony**

Defendant argues the trial court prejudicially abused its discretion by allowing a gang expert to testify. He contends the expert's testimony was unnecessary and irrelevant to any material issue because there were no gang charges or allegations, no evidence of gang membership by anyone involved, and he never said or gestured any gang slogans on the night of the shooting.

A. **Additional Background**

Prior to trial, the prosecution filed a motion to submit evidence defendant's motive for the homicide was gang related. The prosecution's proposed gang evidence included Haro's testimony, a gang expert's testimony, and a social media video showing defendant with gang members in a rap music video. In response, defendant moved in limine to exclude the rap music video.

During the in limine hearings, the trial court acknowledged gang evidence might be relevant to motive but Evidence Code section 352.2[5] bears on evidence like the rap

---

[5] The trial court did not specify the statutory section, but the record indicates discussion of the rap music video was centered on Evidence Code section 352.2.

music video. Based on this evidentiary statute, the court granted defendant's request to exclude the video. The prosecution requested the gang expert still be permitted to testify about the reason for the fight including about the gang rivalry, as well as explanation of the hand gestures and colors of clothes worn. The prosecution conceded no gang allegations had been made but argued the hand gestures and gang slurs were relevant to motive for what started the fight. The court indicated it would allow the gang expert to testify about the history of the gangs, and background information that would contextualize the evidence for the jury but not allow the expert to opine defendant was a gang member. Defense counsel argued the danger in allowing the gang expert's testimony was that the jury could conclude defendant was a gang member and be confused by the evidence. Counsel claimed it was prejudicial and unfair for the prosecution to present evidence of gang animus on one side and place defendant who is not a gang member "in the same boat as" the group being attacked. The court responded to defense counsel: "I'm not going to allow [the prosecution] to have some expert get up there and testify that [defendant] is a gang member, in his opinion. But I don't think it would be fair to the other side, to exclude what is clearly relevant evidence that you have these two rival gangs that get into a conflict, and, therefore, there's some motive here for a fight to start. [¶] That doesn't necessarily mean that [defendant], you know, is gang motivated, as opposed to motivated to protect his brother, as maybe any brother might. But this is relevant evidence. It's prejudicial, in a sense that it's harmful to the defendant's cause. But it's not unduly prejudicial, in the sense that it's going to lead this jury or confuse them or consume an undue amount of time. It's not unduly prejudicial, in the context, as I understand them, which involve the homicide of a person."

Defense counsel reiterated that allowing the gang expert to testify would paint defendant as a gang member without evidence he is in fact one. The store's videos did not show defendant doing anything gang related with hand signals or words. If the expert suggests defendant was a gang member based on his shoes or tattoo, defense counsel

10.

argued he could not ask questions about defendant's lack of membership without opening the door to other gang evidence like the rap music video.

The trial court clarified it had already ruled the music video inadmissible. The court reiterated the gang expert would not be allowed to offer an opinion on whether defendant is a gang member because that opinion relies on the excluded music video and no gang allegations had been made. The court ruled the gang evidence was admissible as relevant to motive, provocation, self-defense, and imperfect self-defense. The court opined admitting the evidence would be fair to the prosecution in putting on their case to provide context to some of the evidence that would be presented and would enlighten rather than confuse the jury. The court would allow testimony about the gangs' background, the history of the rivalry, and the significance of colors and numbers, but would not allow the expert to testify defendant was a gang member. When pressed by defense counsel on whether the expert could comment on defendant's tattoo, the court stated the expert would be allowed to testify the tattoo could plausibly be consistent with gang membership or at least be perceived that way. The court likewise ruled the expert could testify about gang-related colors. Defense counsel maintained his objection to admission of the gang evidence while noting he would likely not object when the evidence was presented to the jury.[6]

At trial, Kirk discussed the rivalry between the Norteños and Sureños, each gang's respective hand signals and colors, and the expectation of a gang member to respond to an attack by a rival gang member, as detailed above.

---

[6]     The Attorney General does not argue forfeiture of the issue on appeal. The issue was preserved for appeal given defendant's vigorous objections to admission of the gang evidence before the trial court. (See *People v. Memory* (2010) 182 Cal.App.4th 835, 856–857 (*Memory*).)

B. **Applicable Law**

Only relevant evidence is admissible.  (Evid. Code, § 350.)  Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  The court may exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)

"California courts have long recognized the potential prejudicial effect of gang evidence."  (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167.)  "Gang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense."  (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449; see also Evid. Code, § 1101, subd. (a).)  Gang evidence may however be admissible and "relevant to establish the defendant's motive, intent or some fact concerning the charged offenses other than criminal propensity .…"  (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223 (*Albarran*); *People v. Flores* (2020) 9 Cal.5th 371, 398 (*Flores*).)  In general, evidence of gang affiliation and membership "including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime."  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049, superseded by statute on another ground as recognized in *People v. Cardenas* (2025) 18 Cal.5th 797, 819.)  "Such evidence is admissible even when a gang enhancement is not charged, provided the probative value of the evidence is not substantially outweighed by its prejudicial effect."  (*People v. Ramirez* (2022) 13 Cal.5th 997, 1095.)

Even if gang evidence is relevant, "[t]rial courts must 'carefully scrutinize'

12.

gang-related testimony before admitting it into evidence, because the content of such testimony 'may have a highly inflammatory impact on the jury.' " (*Flores*, *supra*, 9 Cal.5th at p. 402.) "The decision on whether gang evidence is relevant and not unduly prejudicial rests within the broad discretion of the trial court. [Citation.] We will not disturb a trial court's exercise of discretion ' " 'except on a showing that the [trial] court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' [Citation.] The appellant bears the burden to demonstrate abuse of discretion and prejudice." (*People v. Garcia* (2024) 107 Cal.App.5th 1040, 1050; *People v. Chhoun* (2021) 11 Cal.5th 1, 31 [a ruling on the admissibility of gang evidence is reviewable for abuse of discretion].)

The erroneous admission of gang evidence is generally reviewed under the *People v. Watson* (1956) 46 Cal.2d 818 state law standard for prejudice unless the error resulted in a due process violation that rendered the trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) Under the *Watson* test, "[t]he reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*Partida*, at p. 439.)

C. **Analysis**

Here, the gang expert's testimony was relevant and admissible. It demonstrated the rivalry between the Norteños and Sureños was the impetus for the fight between the two groups that ultimately led to defendant shooting Barrera. Just before the fight, defendant's brother, Rene, flashed a four and one with his hands at Barrera's group and Barrera made hand gestures in response. Kirk explained gesturing a number four with a number one indicates membership with the Norteños and is considered disrespectful when flashed at a perceived Sureño gang member. Kirk also provided context for the gang slurs exchanged between the groups. Saying "f[***] the norte," would be offensive to a Norteño, while saying "f[***] south side," would be offensive to a Sureño. Kirk's testimony provided context as to why Barrera and his group became antagonized enough

to rush defendant and his brother and start the fight that led to the shooting. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 655 [the prosecution was entitled to present gang evidence to give context for the defendant's statement before the killing].)

Defendant argues Kirk's testimony had no better evidentiary or explanatory value than Haro's testimony that led her to "automatically" think the groups' exchange was gang related. He contends Haro's lay opinion gave the jury everything it needed without the imprimatur of irrelevant but prejudicial hearsay expert testimony, and her testimony together with the store's videos was superior to Kirk's testimony. We are not persuaded. Because the videos did not record audio, Haro gave necessary evidence about what was said between the two groups before the fight. But Haro's testimony and the videos lacked context without explanation for the gang-related significance of the hand gestures and gang slurs exchanged. And while Haro provided her lay understanding of the groups' exchange, "[g]ang sociology and psychology are proper subjects of expert testimony [citation] as is 'the expectations of gang members … when confronted with a specific action' [citations]. Expert testimony is admissible to establish the existence, composition, culture, habits, and activities of street gangs," as well as gang rivalries. (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1120, italics omitted.) Nothing indicates Haro was qualified to give expert testimony explaining the history and rivalry between the Norteños and Sureños, and the related background explaining the significance of specific gang signs and slurs. In contrast, Kirk was a peace officer for 17 years including two years as a gang detective, had contact with gang members "hundreds, if not thousands" of times, and received extensive training in gangs. He had also previously been identified as a gang expert in court. Kirk's testimony related to a subject "sufficiently beyond common experience" that would assist the jury's understanding of the source for the groups' fight. (Evid. Code, § 801, subd. (a); see also *People v. Vang* (2011) 52 Cal.4th 1038, 1044 [a criminal street gang's culture and habits meets the criterion for expert opinion testimony under Evid. Code, § 801].)

14.

Defendant suggests if the prosecution has insufficient evidence to prove a gang enhancement or does not make a gang allegation, there can be no gang-related motive for a crime and thus, no reason to admit gang evidence.  He claims the prosecutor cannot separate a gang "motive" from a gang "benefit" to show the motive was gang related.  Not so.  A crime may still have a gang-related motive and gang evidence be relevant to the charged offenses even where the prosecution does not allege a gang offense.  (E.g., *People v. Chhoun*, *supra*, 11 Cal.5th at pp. 31–33 [gang evidence was relevant and admissible despite no gang-related allegations]; *Flores*, *supra*, 9 Cal.5th at p. 402 [gang testimony was highly relevant to the defendant's motive for the charged crimes though the prosecution did not allege a gang enhancement].)  Our Supreme Court has expressly held evidence of a gang-related motive may be admissible regardless of whether a gang allegation is charged.  (*People v. Ramirez*, *supra*, 13 Cal.5th at p. 1095.)  Furthermore, gang-related "motive" is not synonymous with gang "benefit" as that term is used in the criminal street gang law (§ 186.22).  "A 'motive' is defined as a '[c]ause or reason that moves the will and induces the action[,]' '[a]n inducement, or that which leads or tempts the mind to indulge a criminal act.'  [Citation.]  Motive is an intermediate fact which may be probative of such ultimate issues as intent [citation], identity [citation], or commission of the criminal act itself [citation]."  (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1017−1018.)  Whether an offense provides a "benefit" to a criminal street gang is more narrowly construed under section 186.22.  To prove a criminal street gang engaged in a pattern of criminal activity, the prosecution must show "the common benefit from the [gang's] offenses is more than reputational."  (§ 186.22, subd. (e)(1).)[7]  Bolstering one's reputation with the gang is a recognized gang-related motive for an offense (*Memory*,

---

[7]    "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."  (§ 186.22, subd. (g).)

*supra*, 182 Cal.App.4th at pp. 858−859) but would not qualify as a "benefit" to the gang under section 186.22.

Defendant also claims Kirk's brief explanation of a criminal street gang was insufficient because the definition of a criminal street gang in section 186.22 was narrowed by the Legislature effective January 1, 2022. (See Assembly Bill No. 333 (2021−2022 Reg. Sess.); *People v. Tran* (2022) 13 Cal.5th 1169, 1206.) This argument misses the mark. As defendant repeatedly points out, no gang offense or enhancement was alleged in this case. The prosecution was consequently not required to establish the necessary elements for an active gang participation charge or enhancement under the amended section 186.22 when neither was alleged.

Defendant relies on *Albarran* and *Memory* to argue the gang evidence presented was irrelevant and unduly prejudicial. Both cases are inapposite.

In *Albarran*, the defendant was convicted of attempted murder and other offenses with a true finding on a gang enhancement that the crimes were committed for the benefit of a criminal street gang. The defendant moved for a new trial on the grounds that the gang enhancement was not supported by sufficient evidence and the admission of gang evidence was irrelevant and prejudicial. The trial court granted the motion as to the gang enhancement but denied it as to the other charges. On appeal, the defendant argued the gang evidence was unduly prejudicial as to the underlying charges if there was insufficient evidence to support the gang enhancement. (*Albarran*, *supra*, 149 Cal.App.4th at p. 222.) The prosecution argued the defendant's motive for the shooting was to gain respect within his gang. The Court of Appeal disagreed, concluding "there was insufficient evidence to support the contention that this shooting was done with the intent to gain respect" because no evidence showed the defendant shot the victim to enhance his reputation with his gang. (*Id*. at p. 227.) The court found even if evidence of the defendant's gang membership and some other gang evidence was relevant to motive and intent, "certain of the gang evidence, i.e., threats against police, reference to the

16.

Mexican Mafia, and descriptions of other crimes committed by other gang members, was irrelevant, cumulative and presented a substantial risk of undue prejudice." (*Id*. at p. 228.) This "extremely and uniquely inflammatory" gang evidence was so prejudicial it "could only have served to cloud [the jury's] resolution of the issues." (*Id*. at p. 230.) The court concluded the defendant's case was "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair." (*Id*. at p. 232.)

The convictions in *Memory* arose out of a fight between two groups at a bar. The two defendants were members of the Jus Brothers motorcycle club. (*Memory*, *supra*, 182 Cal.App.4th at p. 837.) The trial court ruled a gang expert's testimony was inadmissible but admitted other evidence about the Jus Brothers that allowed the gang expert's testimony to come in through other witnesses. (*Id*. at p. 852.) Though the prosecution couched the Jus Brothers evidence as relevant to motive and identity, the evidence was offered to show the defendants had a criminal disposition to fight with deadly force despite no evidence of this disposition. (*Id*. at p. 859.) The Court of Appeal found this evidence inflammatory because the "prosecutor sought through its opening statement, structure of its case-in-chief, examination of witnesses, and in closing arguments, to continually portray [the] defendants as members of a violent" motorcycle club. (*Id*. at p. 861.) The Jus Brothers evidence "served not only to destroy [the] defendants' credibility and paint them as violent, but also to bolster the credibility of prosecution witnesses who were otherwise suspect." (*Id*. at p. 863.) Given the trial amounted to a credibility contest, the Court of Appeal concluded there was a reasonable probability of a different outcome if the "irrelevant, inflammatory" gang evidence had not been admitted. (*Ibid*.)

The facts of this case differ materially from *Albarran* and *Memory*. In *Albarran*, there was no evidence the motive for the shooting was gang related. While *Memory* involved a fight between two groups like this case, there was no evidence the fight was

related to a gang rivalry. Here, although defendant was not himself shown to be a gang member, the evidence showed the animosity between defendant's group and Barrera's group was fueled by the rivalry between the Norteños and Sureños. The lower courts in *Albarran* and *Memory* also allowed the jury to hear extensive gang evidence that was inflammatory, cumulative, and irrelevant. In this case, the trial court excluded the rap music video from evidence and allowed the prosecution to present only Kirk's testimony. The court limited the scope of Kirk's testimony to the history of the rivalry between the two gangs and background information about the gangs' hand gestures, colors, and tattoos. As discussed above, this was relevant to provide context about the cause of the fight. The court expressly precluded Kirk from opining on defendant's gang membership. His testimony was limited in scope, not proffered to show defendant was criminally disposed, and was neither inflammatory nor irrelevant. It provided context for the fight no other evidence could and was not cumulative to other evidence. Unlike *Albarran* and *Memory*, the gang evidence in this case was relevant and admissible, and its probative value was not substantially outweighed by its prejudicial effect.[8]

Defendant briefly contends the resulting prejudice in this case rises to the level of application of *Chapman v. California* (1967) 386 U.S. 18. This contention is without merit. The gang evidence served legitimate purposes and did not render defendant's trial fundamentally unfair in violation of his right to due process. Kirk's testimony was brief, consisting of just 13 pages of the reporter's transcript. While the trial court did not give the jury a limiting instruction on the use of Kirk's testimony,[9] the verdict makes clear the

---

[8] Defendant's reliance on *People v. Huynh* (2021) 65 Cal.App.5th 969 is similarly misplaced. In that case, there was no evidence the group the defendant associated with was a criminal street gang and there were no reports of gang colors, signs, shouts or announcements during the fights that precipitated the murder the defendant committed. (*Id*. at p. 982.) Here, there was evidence of gang signs and slurs before the fight.

[9] In his reply brief, defendant claims the jury had no legal framework within which to consider the gang evidence because no instruction regarding the gang evidence was given. "Generally, 'arguments made for the first time in a reply brief will not be

18.

jury was not tainted by an inference defendant was criminally disposed. The prosecution sought a first degree murder conviction but the jury acquitted defendant of that charge and found him guilty of the lesser offense of second degree murder. This indicates the jury reached its verdict based on the evidence, not impermissible character considerations. (E.g., *People v. Hill*, *supra*, 191 Cal.App.4th at p. 1140 [evidence of gang-related shootings was not prejudicial where jury rejected first degree murder charge and found second degree murder only].) This case cannot be characterized as "the rare and unusual" one where the admission of evidence violated the defendant's federal due process right and rendered the trial fundamentally unfair. (*Albarran*, *supra*, 149 Cal.App.4th at p. 232.)

Applying the state law standard for error, defendant fails to demonstrate prejudice resulted from admission of Kirk's testimony. Overwhelming evidence supported defendant's guilt for second degree murder. The videos recorded the fight and resultant shooting from multiple angles. The jury saw defendant draw his gun and repeatedly shoot at Barrera as he fled shirtless back to his truck. The videos do not show Barrera had a visible weapon during the fight, while running away, or when he was getting into his truck. Because there was no evidence defendant was in imminent threat of injury or death when he shot at Barrera, the jury was entitled to reject his self-defense argument and convict him for murder. The jury, however, rejected the prosecution's argument the murder was premeditated and deliberate and found defendant guilty of only

---

entertained because of the unfairness to the other party.' " (*People v. Tran*, *supra*, 13 Cal.5th at p. 1208.) In any event, the trial court is only required to give a limiting instruction on gang evidence upon request (*People v. Hernandez*, *supra*, 33 Cal.4th at pp. 1051–1052; Evid. Code, § 355), and the record reflects defendant declined a limiting instruction. Specifically, the prosecutor proposed giving an instruction on limited purpose evidence (CALCRIM No. 303) for the gang evidence, but the trial court considered it unnecessary because the gang evidence came in accordance with the in limine ruling and the court believed the instruction might confuse the jury. Defense counsel agreed with the court and the instruction was not given.

19.

second degree murder.  There is no reasonable probability of a more favorable verdict absent the admission of the gang expert's testimony.  (*People v. Davis* (1996) 42 Cal.App.4th 806, 813 [admission of gang evidence was harmless error where evidence of guilt was overwhelming].)

II.   **Prosecutorial Misconduct**

Defendant argues the prosecutor's use of the gang expert's testimony during closing argument was misconduct.  He contends the prosecutor repeatedly discussed the Norteños and Sureños during argument and made an improper guilt by association argument.

A.  **Additional Background**

During the prosecutor's closing argument, she discussed the self-defense instruction.  She argued Barrera and his friend "abandon[ed] the fight," and defendant started shooting because he "lost the fight, and he was angry."  The prosecutor further argued in relevant part:  "the defendant had to pull the gun, because, first, he lost.  And second, we can infer that he felt disrespected, right?  [¶]  You heard from the gang expert about respect, and how that is very important in any situation where gangs might be involved.  So what happens if somebody loses their respect, their reputation of being tough?  [¶]  You cannot allow that to happen.  You heard some testimony about how the Norteños and Sureños are rivals, and if a Sureño attacks a Norteño, the other ones are supposed to join.  If a Norteño loses against a Sureño, what is that going to mean, you know?  That is going to bring their reputation down within the gang, and so what is there to do; what is left to do?  [¶]  If you lose a fight and you have a gun, this is what you do, you shoot, even if the people are running away and they have their backs to you."  The prosecutor talked again about the importance of respect in gang culture and argued defendant had a motive not to lose respect.  Defense counsel made no objections during the prosecutor's closing argument.

In defense counsel's closing argument, he argued defendant did not engage in a

mutual fight because Barrera outweighed defendant by 85 pounds and both Barrera and his cohort attacked him. He claimed defendant was "fighting for his life" when Barrera's group attacked and he had the right to defend himself. Counsel averred defendant reasonably believed Barrera and his cohort were "going for a weapon" when they went to Barrera's truck, and defendant "defended himself."

During rebuttal argument, the prosecutor responded to defense counsel's self-defense argument: "How is [defendant] going to die; the fight was over. I'll present you with this question, did he have to fight not to die, or did he have to fight so he does not lose the respect of his called gang members, of his brother." Defense counsel objected: "Misstates the evidence regarding gang membership." The trial court overruled the objection stating, "It's argument."

B. **Applicable Law**

"A prosecutor's conduct violates the federal Constitution when it ' "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citation.] 'Conduct that does not render a trial fundamentally unfair is error under state law only when it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' [Citations.] When a misconduct claim 'focuses on the prosecutor's comments to the jury, we determine whether there was a reasonable likelihood that the jury construed or applied any of the remarks in an objectionable fashion.' " (*People v. Nadey* (2024) 16 Cal.5th 102, 156 (*Nadey*).)

C. **Analysis**

Defendant argues the prosecutor exacerbated the trial court's error in admitting the gang expert's testimony by referring repeatedly to the Norteños and Sureños during her closing argument including on issues of respect, disrespect, retaliation, punishment for not retaliating, and gang reputation. The Attorney General responds that defendant did not object to these instances of the prosecutor's argument and thus forfeited this claim. Generally, a defendant may not complain on appeal of prosecutorial misconduct unless

21.

the defendant made a timely objection and requested an admonition. (*Nadey*, *supra*, 16 Cal.5th at p. 159.) A defendant will be excused from making an objection or requesting an admonition if either would be futile. (*People v. Foster* (2010) 50 Cal.4th 1301, 1350.) Defendant did not object to any of the prosecutor's discussion of the Norteños and Sureños during her closing argument. Nothing in the record indicates an objection and request for admonition would have been futile. Defendant's failure to object forfeits the claim on appeal.

Defendant did object to the prosecutor's argument during rebuttal that defendant had to fight so he would not lose the respect of gang members. On appeal, defendant argues this was an improper guilt by association argument. The Attorney General concedes a guilt by association argument constitutes misconduct (see *People v. Lopez* (2008) 42 Cal.4th 960, 967) but contends defendant forfeited this claim as well because he did not object on the same grounds he now raises on appeal. He instead objected on the grounds the prosecutor was misstating the evidence regarding gang membership, and the trial court overruled this objection. To preserve a prosecutorial misconduct claim for appeal, a defendant ordinarily must object on the same grounds raised on appeal. (*People v. Hill* (1998) 17 Cal.4th 800, 820.) Defendant's failure to object that the prosecutor was making an improper guilt by association argument deprived the trial court of the opportunity to rule on that issue and the claim is forfeited on appeal. (*Nadey*, *supra*, 16 Cal.5th at p. 159.)

Even if the claim was preserved, defendant has not shown it is reasonably likely the jury construed the prosecutor's remarks in an improper fashion. The jury was instructed nothing the attorneys say is evidence at the beginning of trial and before closing arguments. The jury instructions specified the attorneys discuss the case during closing arguments, but their remarks are not evidence. The jury was told evidence includes the witnesses' sworn testimony, the exhibits admitted into evidence, and anything else the court told it to consider as evidence (CALCRIM No. 222). The jury

was also instructed not to let bias influence their assessment of the evidence or decisions and base their decisions solely on the evidence presented (CALCRIM No. 209). Even if the prosecutor's remarks were improper, defendant has not shown they were prejudicial. (*Nadey*, *supra*, 16 Cal.5th at p. 160 [the prosecutor's allegedly improper remarks not prejudicial where countered by jury instructions].)

## III. Sufficiency of the Evidence

Lastly, defendant contends his second degree murder conviction is not supported by sufficient evidence. He claims no rational juror could have found proof beyond a reasonable doubt that he did not act either (1) in the actual belief in the need for self-defense whether that belief was reasonable or unreasonable, or (2) in the heat of passion on adequate provocation. Thus, he claims his murder conviction must be reversed or at least reduced to voluntary manslaughter.

### A. Standard of Review

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime … beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient

23.

substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357, fourth, fifth, & sixth bracketed insertions in original; see *People v. Johnson* (1980) 26 Cal.3d 557, 562; *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320.)

"Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence." (*In re Michael D.* (2002) 100 Cal.App.4th 115, 126.) "Whether the evidence presented at trial is direct or circumstantial, … the relevant inquiry on appeal remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Towler* (1982) 31 Cal.3d 105, 118.) "Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 358.)

B. **Murder, Self-Defense, and Heat of Passion**

Murder is the unlawful killing of a human being with malice aforethought. (*People v. Schuller* (2023) 15 Cal.5th 237, 243; § 187, subd. (a).) "The mens rea element required for murder is a state of mind constituting either express or implied malice." (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).) Malice is express when there is a deliberate intent to kill. (§ 188, subd. (a)(1).) Malice is implied "when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988; § 188, subd. (a)(2).) "Second degree murder is the unlawful killing of a human being with malice aforethought, but without the premeditation, deliberation and willfulness necessary to elevate the offense to first degree murder." (*People v. Bohana* (2000) 84 Cal.App.4th 360, 368; *People v. Knoller* (2007) 41 Cal.4th 139, 151.)

"Criminal homicide is divided into two types:  murder and manslaughter."

24.

(*Beltran*, *supra*, 56 Cal.4th at p. 941.)  While murder requires malice aforethought, "manslaughter is defined as 'the unlawful killing of a human being without malice' (§ 192).  Thus, the 'distinguishing feature [between the two offenses] is that murder includes, but manslaughter lacks, the element of malice.' " (*People v. Schuller*, *supra*, 15 Cal.5th at p. 252.)  "Malice is presumptively absent when the defendant acts upon a sudden quarrel or heat of passion on sufficient provocation (§ 192, subd. (a)), or kills in the unreasonable, but good faith, belief that deadly force is necessary in self-defense.  [Citation.]  Only these circumstances negate malice when a defendant intends to kill." (*People v. Manriquez* (2005) 37 Cal.4th 547, 583 (*Manriquez*).)  "The resulting crime is voluntary manslaughter, a lesser included offense of murder." (*People v. Dominguez* (2021) 66 Cal.App.5th 163, 174 (*Dominguez*).)  When self-defense or heat of passion are at issue, the prosecution must disprove those circumstances beyond a reasonable doubt. (*Schuller*, at p. 254.)

Self-defense may be perfect or imperfect.  (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)  A homicide is lawful and justified where a person acts in perfect self-defense—the actual and objectively reasonable belief in the need to defend against imminent threat of death or great bodily injury.  (*Ibid*.; § 197.)  "Imperfect self-defense arises when a defendant acts with a subjectively honest but objectively unreasonable belief that he or she is in imminent danger of death or great bodily injury." (*People v. Temple* (2025) 110 Cal.App.5th 1281, 1295.)  "Perfect self-defense results in a defendant's complete exoneration.  [Citation.]  Imperfect self-defense negates the mental state of express malice.  [Citation.]  Imperfect self-defense, by negating malice, means a defendant cannot be convicted of murder but can be convicted of voluntary manslaughter." (*Ibid*.)  " 'The subjective elements of self-defense and imperfect self-defense are identical.  Under each theory, the [defendant] must actually believe in the need to defend … against imminent peril to life or great bodily injury.' " (*People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 744.)  " 'Fear of future harm—no matter how

great the fear and no matter how great the likelihood of the harm—will not suffice.  The defendant's fear must be of *imminent* danger to life or great bodily injury.  " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future.  *An imminent peril is one that, from appearances, must be instantly dealt with.*' " ' " (*Manriquez, supra*, 37 Cal.4th at p. 581.)

Like self-defense, "[h]eat of passion has both objective and subjective components.  Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Enraca* (2012) 53 Cal.4th 735, 759.)  "The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim or by conduct reasonably believed by the defendant to have been engaged in by the victim." (*People v. Choyce* (2025) 18 Cal.5th 86, 105.)  The " ' "heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances," because "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable [person]." ' " (*Manriquez, supra*, 37 Cal.4th at p. 584.)  "Subjectively, 'the accused must be shown to have killed while under "the actual influence of a strong passion" induced by such provocation.' " (*Enraca*, at p. 759.)  "The passion aroused need not be anger or rage, but can be any intense emotion other than revenge.  [Citation.]  Thus, a defendant's 'immediate fear and panic' can, in an appropriate case, provide evidence from which 'a reasonable jury could infer that defendant was aroused to passion, and his reason was thus obscured ….' " (*Dominguez, supra*, 66 Cal.App.5th at p. 175.)

C. **Relevant Instructions**

The jury was instructed on murder in both degrees (CALCRIM No. 520), complete (or perfect) self-defense (CALCRIM No. 505), imperfect self-defense

26.

(CALCRIM No. 571), and heat of passion (CALCRIM No. 570). The jury was instructed that to prove defendant was guilty of murder, the People must prove defendant committed an act that caused another person's death, acted with malice aforethought, and killed without lawful justification (CALCRIM No. 520).

The jury instruction on complete self-defense provided in relevant part: "The defendant acted in lawful self-defense or defense of another if: [¶] 1. The defendant reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury; [¶] 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger." (CALCRIM No. 505.) The instructions on imperfect self-defense explained to the jury the difference between complete and imperfect self-defense "depends on whether the defendant's belief in the need to use deadly force was reasonable." (CALCRIM No. 571.) The jury was also instructed the right to use force in self-defense or defense of another "continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends." (CALCRIM No. 3474.)

The jury instruction on heat of passion provided in relevant part: "The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." (CALCRIM No. 570.) The jury was also given CALCRIM No. 522 about the effect of provocation on murder.

We presume the jury followed the trial court's instructions. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 821.) Therefore, to find defendant guilty of

27.

second degree murder, the jury necessarily concluded defendant intentionally shot and killed Barrera with either express or implied malice, and defendant did not kill Barrera in perfect or imperfect self-defense, or in the heat of passion.

D. **Analysis**

Contrary to defendant's claim he could not be convicted of murder or could only be convicted of voluntary manslaughter, substantial evidence supports the second degree murder conviction. As noted, "[t]he elements of second degree murder are: (1) an unlawful killing; (2) accomplished with malice aforethought, whether express or implied." (*People v. Malfavon* (2002) 102 Cal.App.4th 727, 735.)

Substantial evidence shows and the jury could reasonably conclude defendant acted with either express or implied malice when he shot at Barrera. The videos showed from more than one angle that, as Barrera was running away, defendant pursued, pulled out his gun, racked the slide, and fired six times at Barrera in rapid succession. The jury could reasonably infer defendant acted with an intent to kill by purposefully firing a gun multiple times at Barrera from close range. (*People v. Smith* (2005) 37 Cal.4th 733, 742.) Even if the jury did not believe defendant intended to kill Barrera, the jury could reasonably infer defendant knew repeatedly firing a gun at Barrera was dangerous to human life and acted with conscious disregard for life. That is sufficient to find defendant guilty of second degree murder.

Defendant argues the videos established that the circumstances of the fight were "sufficient to excite the fears of a reasonable person" (§ 198) to support a finding of self-defense as a matter of law. We disagree. " ' "[W]here the evidence is uncontroverted and establishes all of the elements for a finding of self-defense it may be held as a matter of law that the killing was justified; however, where some of the evidence tends to show a situation in which a killing may not be justified then the issue is a question of fact for the jury to determine." ' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1044.) The videos did not show either Barrera or his cohort had a weapon when

28.

they rushed into the store and engaged defendant in combat. Defendant was undeniably outnumbered, but this was a physical fight. Barrera's cohort abandoned the fight and ran toward Barrera's truck with a shirtless Barrera following. Defendant ran after and shot at Barrera as he was trying to get into his truck. At no point do the videos show Barrera or his cohort had or displayed a weapon, nor was there any other evidence they were armed. While Barrera was the initial attacker, the jury could reasonably infer Barrera had abandoned the fight when he stopped striking defendant and ran toward his truck. As the jury was instructed, defendant was no longer entitled to use force once his attackers withdrew.

While defendant may have feared injury or death during the fight, as a reasonable person outnumbered in a fight might, there is no evidence that danger remained after defendant's attackers stopped striking him and ran away. The autopsy showed Barrera was shot twice in the back and the videos reflected Barrera was not facing defendant when he was shot. The jury could reasonably have found a shirtless Barrera with his back to defendant no longer posed a danger. Furthermore, "a reasonable opportunity to retreat may defeat a claim of perfect or imperfect self-defense because 'the opportunity to retreat means that no use of force was reasonable.' " (*Dominguez*, *supra*, 66 Cal.App.5th at p. 181.) Defendant had an opportunity to retreat by running away himself once Barrera and his cohort ran toward Barrera's truck. Instead, defendant escalated the encounter by introducing a gun into the exchange.

Assuming Barrera still posed an imminent danger while running away with his back to defendant, a dubious assumption at best, defendant's right of self-defense was limited to the use of such force as was reasonable under the circumstances. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1065.) Accordingly, "[e]ven when faced with imminent fear of death, a person may only use force reasonably necessary to repel the attack, and 'only as long as the danger exists or reasonably appears to exist.' [Citation.] A defendant who had an actual and reasonable belief in being in imminent danger of death, but used

more force than was reasonably necessary to repel the attack, or continued to use force after the danger no longer existed or reasonably appeared to exist, may not invoke self-defense." (*People v. Temple*, *supra*, 110 Cal.App.5th at p. 1297; *People v. Hardin* (2000) 85 Cal.App.4th 625, 629–630.) Defendant claims he did not use excessive force because he was responding to an overpowering assault by two men using force likely to result in great bodily injury. But defendant did not pull out the gun during the assault; he pulled the gun and fired at his assailants after they stopped the fight and were fleeing. Defendant's use of a gun constituted excessive force to repel a purely physical attack that his victim had presumably abandoned.

Because the jury found no premeditation or deliberation, defendant claims that left only a theory of murder premised on the supposition that neither defendant nor his companions feared for their lives but instead defendant had an intent to kill for gang-related purposes. The record does not support this overly narrow view of defendant's intent, particularly since the prosecution was precluded from presenting evidence defendant was a gang member.

We also reject defendant's argument no rational juror could find proof beyond a reasonable doubt he did not act in the heat of passion on adequate provocation. "Adequate provocation and heat of passion must be affirmatively demonstrated." (*People v. Lee* (1999) 20 Cal.4th 47, 60.) Consequently, a defendant must "*actually* be motivated by passion in committing the killing." (*Beltran*, *supra*, 56 Cal.4th at p. 951; *Manriquez*, *supra*, 37 Cal.4th at p. 584 [the defendant must actually, subjectively, kill under the heat of passion].) Defendant failed to show by any evidence that he was enraged, angered, or in fear due to Barrera's attack. No prior statements by defendant were admitted into evidence, and he did not testify at trial. No witnesses testified defendant exhibited anger, rage, or fear when he pulled out a gun and shot Barrera. Assuming the videos could indicate defendant was motivated by passion, "the circumstances giving rise to the heat of passion are also viewed objectively."

(*Manriquez*, at p. 584.)  The victim's conduct must be sufficiently provocative to "arouse feelings of homicidal rage or passion in an ordinarily reasonable person."  (*People v. Pride* (1992) 3 Cal.4th 195, 250.)  The evidence shows Rene, not defendant, incited Barrera's group by flashing a gang sign in their direction, but defendant was the one attacked by Barrera and his cohort in a two-on-one fight.  While these facts could create a basis for provocation of defendant by heat of passion, reversal is not required where the circumstances might also reasonably be reconciled with a contrary finding.  And a rational trier of fact could find the provocation insufficient to arouse deadly rage.  The fight was brief and there was no evidence defendant was injured, especially given the videos showing he quickly got up and pursued Barrera and his cohort.  The circumstances reasonably justified the jury's finding defendant did not kill in a heat of passion.

In conclusion, defendant's second degree murder conviction was supported by substantial evidence, and the jury had a sufficient basis to conclude defendant did not act in perfect or imperfect self-defense, or in the heat of passion.

## DISPOSITION

The judgment is affirmed.


PEÑA, J.

WE CONCUR:


LEVY, Acting P. J.


FRANSON, J.

31.